# PATTERSON *v.* THE OCEAN ACCIDENT AND GUARANTEE CORPORATION.*

DECLARATIONS AS EVIDENCE; ACCIDENT INSURANCE; RES GESTÆ; PROXIMATE CAUSE AS A QUESTION FOR JURY; POLICIES OF INSURANCE, CONSTRUCTION OF; BODY OF INSURED, RIGHT OF INSURANCE COMPANY TO EXAMINE.

1. Declarations by a decedent, an osteopath, to his wife and brother-in-law, that he had accidentally strained his back while treating a patient, and was suffering great pain, made within half an hour after commencing such treatment, are admissible as part of the *res gestæ,* in an action on an accident insurance policy held by him.

2. Statements made by the insured in such a case to his attending physician on the day after the alleged accident, tending to show his bodily pain,

---

*Evidence—Declarations.*—As to the admissibility in evidence of declarations, see the following editorial notes presenting the authorities on their respective subjects: Dying declarations as evidence, note to *Worthington* v. *State,* 56 L. R. A. 353; how near the main transaction must declarations be made in order to constitute part of the *res gestæ,* note to *Ohio & M. R. Co.* v. *Stein,* 19 L. R. A. 733; proof against one person of declarations by another to show partnership, note to *Vanderhurst* v. *De Witt,* 20 L. R. A. 595.

*Proximate Cause.*—As to rule of proximate cause in insurance and other cases, see the presentation of the authorities in the following editorial notes: Proximate cause of loss in insurance cases, notes to *Heuer* v. *Northwestern Nat. Ins. Co.* 19 L. R. A. 594; *Beakes* v. *Phoenix Ins. Co.* 26 L. R. A. 267; proximate cause in case of concurrent negligence of third person, note to *Jacksonville, T. & K. W. R. Co.* v. *Peninsular Land, Transp. & Mfg. Co.* 17 L. R. A. 33; rule of proximate cause applied to combined negligence of master and fellow servant, note to *Lutz* v. *Atlantic & P. R. Co.* 16 L. R. A. 819; proximate cause as affecting liability for injury to servant of other person, note to *The Joseph B. Thomas,* 46 L. R. A. 119; rule of proximate cause in case of malicious tort, note to *Isham* v. *Dow,* 45 L. R. A. 87; proximate cause of damage by fire, note to *Brown* v. *Brooks,* 21 L. R. A. 259.

*Insurance—Accident.*—As to what constitutes an accident within the meaning of an accident insurance policy, see the complete presentation of the authorities in editorial note to *Fidelity & C. Co.* v. *Johnson,* 30 L. R. A. 206.

the location of the same, and the symptoms of his malady, are also admissible; but statements by him to his physician tending to show that he received a strain on the day before, to which he attributed his condition, are inadmissible.

3. What is the proximate cause of an injury is generally a question for the jury, to be determined as a fact in view of all the circumstances of fact attending it (following *Guenther* v. *Metropolitan R. Co.* 23 App. D. C. 493); and where, in an action on an accident insurance policy, the evidence tending to show that the death of the decedent was the immediate result of an accident is weak, but it cannot be said that all reasonable men would necessarily conclude that it was not the result of the accident, the case is one for the jury.

4. A strain received in the ordinary course of the insured's business is an accident within the meaning of an accident insurance policy insuring "against accidental bodily injuries caused solely by external, violent, and visible means."

5. The rule of interpretation of contracts of insurance of all kinds is that, in cases of doubt, that interpretation shall be given which favors the insured rather than the insurer; and this rule has its strongest application in relation to those terms of the policy that would work the forfeiture of a right otherwise maintainable.

6. Recovery on an accident policy for the death of the insured is not precluded because of a diseased condition of body existing when the accident occurred, when the accidental injury was the inciting, efficient, and predominant cause of his death, and where the policy insures against "accidental bodily injuries caused solely by external, violent and visible means which shall independently of all other causes,"— disable or cause the death of the insured,—especially where other provisions of the policy tend to indicate that such an interpretation is the correct one.

7. A clause in a policy of insurance providing that there can be no recovery upon it if the right to "examine" the person or body of the insured is refused the company, will not preclude a recovery if a demand by the company for an autopsy or the dissection or exhumation of the body is refused.

No. 1431.   Submitted January 20, 1905.   Decided February 8, 1905.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action upon a policy of accident insurance.                                    *Reversed.*

The COURT in the opinion stated the case as follows:

This action was brought by Alice M. Patterson against the Ocean Accident & Guarantee Corporation, Limited, of London, England, upon a contract of accident insurance made with Henry E. Patterson.

The declaration alleged the issue of the policy by the defendant to Henry E. Patterson June 14, 1901, insuring him for one year against accidental bodily injuries; that, in consideration of the premium paid, the defendant promised, in the event of accidental bodily injuries resulting in the death of said Henry E. Patterson to pay $5,000 to the plaintiff, Alice M. Patterson; that said Henry E. Patterson received an accidental strain on March 28, 1902, which caused his death on April 10, 1902; that due proof of loss has been made as required, and that defendant had refused to pay the sum so promised.

The defendant, among other pleas in bar of the accident, pleaded in substance that the injury alleged was not the cause of the death of the insured; that notice of the injury had not been given as required by the conditions of the policy; and that defendant's right to examine the body of the insured, as stipulated in the policy, had been denied. Demurrer to these pleas was sustained and issue was joined on plea of *non assumpsit.*

The policy was introduced in evidence. It bears date June 14, 1901, and recites that, in consideration of the warranties set forth therein and the receipt of $25, the defendant insures Henry E. Patterson, for the term of one year, "against accidental bodily injuries caused solely, during the term of this insurance, * * * by external, violent, and visible means which shall, independently of all other causes, disable the assured as follows: A. If death shall result in ninety days from date of such bodily injuries, as the actual and direct cause thereof, the corporation will pay the principal sum of five thousand dollars ($5,000) to Alice M. Patterson if surviving."

The policy is lengthy, containing many provisions, conditions,

and exceptions, and only those having some possible bearing on the issues of the case will be set forth.

Section 10, article J, provides that "any medical adviser of the corporation shall have the right and opportunity, as often as he may require, to examine the person or body of the assured in respect to alleged injury or cause of death; and any refusal on the part of the assured, or of the beneficiary, or of the legal representatives of the assured, to comply with this provision, shall operate to defeat the policy."

Clause 13 of the warranty section reads: "My hearing or vision is not impaired; I have never had, nor am I subject to, fits, diseases of the brain, or other mental or bodily infirmities except as herein stated." No special form of application for insurance seems to have been required, but in the warranty section certain facts are written down as statements of the assured, including clause 13, aforesaid.

The plaintiff, Alice M. Patterson, was the wife of the assured.

Dr. Wilber Lee Smith, a brother of the plaintiff, testified to the following facts: Both he and Henry E. Patterson were osteopathists and practised together. He had known Patterson intimately for twenty years. Patterson was forty-two years old, 5 feet 11 inches tall, and weighed 180 pounds. His figure was erect and he was strong and vigorous. Prior to 1897 he had not suffered from illness. In that year he had what was thought to be a case of intestinal obstruction and due to excessive eating of strawberries. He had no illness from that time to his last one that caused him to remain away from his office, but had an occasional ailment, such as headache or indigestion. He had practised osteopathy since 1892 or 1893. The practice of osteopathy consists in manipulating the body, and requires muscular strength. On March 28, 1902, he was treating patients, and about 1 P. M. came out of the treating room. He had his hand on his back, and, meeting witness in the hall, said he had strained himself and was suffering great pain. He went into one of the treating rooms and took off his coat and vest, and witness examined him and gave him a gentle manipu-

lation.    He did not say when it occurred, but witness had seen him about a half an hour before, and he then gave no indications of pain.    Witness could feel a contraction of the muscles between the seventh and ninth dorsal vertebræ.    Manipulation being painful, witness applied a hot-water bottle, which gave temporary relief.    He stayed at the office until about 4 P. M., when he went home.    Witness saw him again the next afternoon.    Dr. George H. Lee attended him.    He complained of grinding pains in the back, that extended around the abdomen.    He was suffering greatly.    Saw him every day until his death, April 10, 1902, about 1:25 A. M.    On cross-examination, witness said that assured had a policy in the Mutual Life Insurance Company; that he had made an affidavit in the matter of that claim, and stated the cause of death as inflammation of the liver,—hepatitis.    Stated in that affidavit also that he had suffered an injury on February 20, 1902.    He did have an accident at that time, but it did not incapacitate him; he did not lose a day from his office.    Did not see the accident, but he told me he had strained his back in raising a window.    Examined him, treated his back by manipulation, and found evidence of a strain.    Dr. Patterson had treated eight or nine patients on March 28, but did not say which one he was treating when he received the strain.    An injury to the muscles of the back cannot affect the liver, except that wrenching of the back could strain the liver.    It might rupture a ligament of the liver. Have read where a strain of the body can produce liver trouble. The only exterior sign visible was some injury to the muscles. There is no muscular tissue in the liver or connected with it, but there are ligaments in the liver.    They do not form a part of the liver, but support it, and when these are strained it is called a strain of the liver.    The contraction of the muscles noticed might have been produced by a variety of causes, but did not think it was.

Dr. George H. Lee was the next witness.    Said he was a homeopathic physician and had been in practice since 1876. Visited the assured twice on March 29, 1902.    Found him suffering severe pain in the epigastrium and diaphragm apparent-

ly, and all that part of the body involving the diaphragm, the epigastrium, and the liver.   The pain was in the region of the abdomen, the right side, and the back.   Conditions were the same morning and evening.   He made statements to the witness as to the cause of his injuries, but on objection of the defendant he was not permitted to repeat them.   To this exclusion the plaintiff excepted.   The patient said the pains were severe, and witness was guided by what seemed to be his condition, the character of the pains, and their locality; of course one is controlled some by the history of the case.   Called on next day and found him worse; he had a chill at 5 P. M., and spent the night with him.   He was then suffering from hepatitis, with signs of jaundice, and the pain had become localized about the liver.   At 8 next day he had another chill, with continued pain and rise of pulse and temperature.   The symptoms became more severe, and he died early in the morning of April 10.   The remainder of witness's evidence is recited in the bill of exceptions as follows:

*Q.* Doctor, what in your opinion was the starting, procuring, or proximate cause of the illness which resulted in Dr. Patterson's death?

*The Court:* Judging just from the symptoms you found when you first saw him and the symptoms he had during the whole of his sickness up to the time of his death, you can base your opinion as to what you suppose was the cause of that condition; as a medical man and an expert you have some opinion; you can form some opinion from those circumstances, and that you can give.   Leave out of your mind anything that he said.   Suppose he had not said anything to you at all, as to how he got hurt, or whether he had been hurt at all or not, and you took the man just as he was and followed him down to his death.   What could you form in your own mind as to the cause of that condition or trouble?

*A.* If he had not told me anything at all, of course I should have cast about in my mind for some probable cause, and per-

haps could have found it, and should simply have accepted the fact that he was in that condition——

*The Court:* What probable cause would have started that condition of affairs?

*A.* There are two or three that could have caused that condition of affairs,—hepatitis may come on from a bilious condition of the system, and the first a man knows is that he has it; he does not know how it comes. If a person has had anything in the nature of an injury we naturally refer to that as being the probable cause.

Another cause that might be explanatory of the symptoms that he had was gall stone,—he might have had gall stones or he might have had a rupture. I mean gall stones from the liver, or, as we call them, biliary calculi, and not vesical calculi, which pertain to the bladder, or he might have had a rupture of the gall bladder. If such was the case it would probably come from an accident of some sort, but it would not be likely to occur unless the patient was in a predisposed condition. It would not be likely to occur in a perfectly well man. If a man is physically well, but who is afflicted with gall stones, it is possible that a strain or wrench would produce rupture of the gall bladder. Gall stones may be of various sizes. It would be possible to precipitate the gall stone into the gall duct by reason of a sudden strain or wrench. It often happens that people having gall stones go through life without suffering any from them, as they may remain in the gall bladder indefinitely without making any serious difficulty. I do not know positively that the patient had gall stones, as that could only be ascertained by an autopsy. I suspected gall stones, and kept a lookout for them, as the symptoms suggested it. There were various symptoms to suggest gall stones. My treatment was in part directed to getting rid of the stone, if one might be in the common duct, and I gave him remedies to act on the liver and gall bladder, and to cause the stone, if one was there, to move along, which finally produced quite free evacuations, but I did not find a stone.

*Q.* Doctor, considering all the pathological conditions and symptoms of Dr. Patterson from the time you first saw him

until his death, state whether or not, in your opinion, his death may have been the result of strain, or rupture of the gall bladder, ligaments, or of the liver itself?

*A.* I do not know that I can answer the question in that form; if you mean rupture of the liver you will have to strike that out.

*Q.* Well, as to the other two, striking out the reference to the liver.

*A.* That would not be probable.

*Q.* May not strain have resulted in rupture of the gall bladder and ligaments?

*A.* Strain might result in rupture of the gall bladder. Yes, that might occur; but I would hardly expect that death would result from rupture of the ligaments or of the liver, but it might result from rupture of the gall bladder.

On cross-examination witness said:

The first time I saw Dr. Patterson was on March 29, 1902, at which time I found no evidence of external injury. There was no discoloration and no condition of the muscles to indicate injury. There were no objective signs of any injury. In Dr. Patterson's case there was undoubtedly a complication, as he had inflammation of the liver; he may have had gall stones, but that could only be determined definitely by an autopsy. I suspected them and looked for them, but did not find them, but you cannot always tell definitely about such things without an autopsy. A gall stone may have been impacted in the duct, and in that event it could not be discovered except by autopsy. There was inflammation of the liver, there was hepatitis, and there may have been gall stones, and there may have been rupture of the gall bladder. There were signs that this might have occurred, but could not be determined definitely without an autopsy. Mrs. Patterson, being overcome with grief, declined to permit an autopsy, and therefore, being uncertain whether there were gall stones or rupture of the gall bladder, I made out the death certificate as hepatitis, because that was the only thing I could be confident of. Hepatitis means inflammation of the liver. There may be various causes

for it.   Hepatitis is acute or chronic.   Chronic hepatitis is slow, and acute hepatitis may be very rapid.   It is sometimes accompanied by acute pain, but not always.   Inflammation of the liver of itself could not ordinarily and directly be produced by a strain of the muscles of the back.   I never knew of a simple stretching of the muscles of the back to produce inflammation of the liver, nor would I expect it to occur in a man of Dr. Patterson's physique from a wrench received while rubbing a patient, but I would not say that it could not occur.

I do know of a case where inflammation of the liver was brought on by a strain of the external muscles of the back. It is a case which happened to myself.   I was riding in a gig; one of these high, two-wheeled gigs that doctors used to ride on in the country.   I was riding over a muddy road with deep ruts in it, when one wheel went down and I received a wrench and a twist which hurt me.   I felt a pain in there then, but I did not think any more about it.   I didn't know anything was the matter with me; but next morning when I got up out of bed and stood on my feet a pain caught me in my liver so terrible that I fell back on the bed, either fainting or almost fainting.   It was very severe, and from that time I had hepatitis.   I had inflammation of the liver.   I suppose that is the way I got it.   I presume I was in a bilious condition.   If I had been perfectly well, I don't suppose it would have hurt me.

In the course of my practice in reading I have never heard of such a case.   Simply by manipulating a patient he would not be likely to produce a strain that could cause hepatitis, but I would not say that it could not occur.   I cannot explain how a muscular strain between the seventh and ninth dorsal vertebræ could carry inflammation to a healthy liver, and if such a result did follow I should say that the man's liver was not in a healthy condition, and that he was predisposed to disease.   If the gall bladder were ruptured, symptoms would probably be jaundice, and there would be acute pain and a rise of temperature.   There would be symptoms pointing unmistakably to the hepatic region. If it were ruptured so as to let out the contents into the peritoneal cavity it would cause peritonitis, which would come on

very quickly.    Gall stones may be precipitated without the patient having suffered any accident at all, as the physiological action of the gall bladder is to expel a stone, and, when expelled, the stone proceeds through the common duct to the duodenum. These stones sometimes, when expelled, become impacted in the duct and cannot move, the result being that the patient succumbs to the conditions that follow, such as jaundice, pain, and severe sickness.    They would be very much the same symptoms as Dr. Patterson manifested, and that condition might have caused his death.

When a stone becomes impacted in the duct the normal functions are prevented from being carried on.    Fearing such might be the case I proposed to Dr. Patterson a surgical operation, but he objected so strenuously that I did not press the subject.    I proposed a consultation, but it was not desired by the patient.

In my report of this death to the insurance company I stated as a history of the disease from first to last "acute hepatitis. He was violently ill when I was called to see him, with pain, fever, rigor, failing strength, and coma."

I also stated in my certificate that the diaphragm, stomach, and other adjacent parts were more or less involved secondarily; that is, sympathetically.

The inflammation of the liver, which I found existing in Dr. Patterson, might have been produced by several causes, as before stated, and any one of those causes might have caused his death.

I made a request for an autopsy to satisfy myself of the real trouble, and I heard that the insurance company also suggested an autopsy.

On redirect-examination witness said:    It is a fact that a rupture of the bladder might have been the result of a strain, wrench, and that sometimes gall stones remain in the gall bladder inactive for quite a long time, and they are sometimes precipitated by external forces of some kind.    If the stone was too large to pass through the common duct it would obstruct the flow of bile and cause jaundice and inflammation.    If it continued long enough it would produce also ulceration, which

would be followed by perforation.   It is hard to tell what might ensue in a case of that kind, because the same thing does not always happen.   Such a condition would, in all probability, produce peritonitis.   The stones differ in size.

On recross-examination witness said: There were no symptoms in Dr. Patterson's case to, at first, indicate peritonitis, but just before his death there were indications of it.   There was distention of the abdomen and tenderness.   That might have arisen from an impaction of gall stones, or it might arise from the discharge of pus and bilious matter into the abdomen.   Any of these causes would give rise to peritonitis.   This pus would have been discharged from a suppurative process going on probably under the surface of the liver in connection with the gall bladder.

*By Mr. Hoehling:* Will you please state whether, on the occasion of your first visit professionally to Henry E. Patterson, on the 29th day of March, 1902, he made any statement to you as to the cause of his condition physically, and if so, state what it was.

Which question was objected to by counsel for the defendant, and the objection sustained.   To the ruling of the court in sustaining said objection the plaintiff duly excepted.

The plaintiff, Alice M. Patterson, testified as follows:

I have known Dr. Patterson since childhood.   His physical condition prior to his death was good.   He was ill only three times since our marriage that I recall.   We were married in 1884.   The first time he was ill was in 1893, when he suffered from acute indigestion, and was sick only one day.   The next time was in 1897; he was suffering from an intestinal obstruction caused by eating strawberries; he was ill three or four days, and returned to his business in about twelve days.   The next illness was facial neuralgia; I think that was before 1893; aside from this he had good health, was a strong man, and attended to his work all the time.   He weighed about 180 pounds, was

6 feet tall, and a muscular man.  His appetite was normal, and he was not of a nervous disposition.  I was at the office on March 28, 1902, engaged with him in the practice of osteopathy.  He had been treating patients all the morning.  He had been treating a patient when he came out in the hall where he met me,— I also had been treating a patient in another room.  He said "I have strained my back, I have given myself a terrible wrench."  He went into one of the treating rooms and I examined him and gave him a gentle treatment in the region of the strain.  It was a strain he had received while working either in lifting or turning a patient over on the table, or something of that sort.  I left him lying on the table with a hot-water bottle on him while I went on with my work.  He said he was suffering acute pain from the twist or lift, that he had overlifted and strained his back.  The hot-water bottle seemed to give him some relief.  He remained on the table for about an hour, then he got up and tried to do some work, but he found the pain too severe, and got Dr. Smith to treat his patient, and he remained in the room for a time, and then went into another room and laid down, where he stayed for two hours, and then he went home.  He said he could not stay any longer because of that severe pain in the back.

Prior to the 28th of March he had not suffered from any trouble except a slight pain that he had nearly a month, or several weeks before, on the 20th of February, when he had a slight strain, from which he quickly recovered.  It did not incapacitate him.  I came to the office with him on March 28, and he was then apparently perfectly well.  I saw him a very few minutes, not over thirty, or perhaps fifteen, I cannot say definitely, before he came into the hall and complained of this strain, and he was then all right, perfectly well.  He went home that day by himself, and I followed in a few minutes.  I found him still suffering extreme pain.  I made him take a hot bath and I rubbed his back with chloroform liniment, and put him to bed.  The pain was on the right side of the spine, between the sixth and seventh vertebræ, and from there down to the ninth or tenth, just over the region of the spine.  About 5 o'clock he com-

plained of pain in the abdomen.   He said the pain seemed to begin in the back and extend around to the front.

I sent for Dr. Lee the next morning about 10 : 30 o'clock. He seemed to grow gradually worse from the time of the injury. Dr. Lee came to the house about 11 : 30, and came back later in the afternoon, as Dr. Patterson had grown very much worse, and at 6 : 30 Dr. Lee had to give him a hypodermic injection. The patient said he could not stand the pain.   He complained chiefly of the pain in his back, but I don't think he was delirious until towards the last.   He died on April 10.   An operation was suggested the evening before he died, but I do not remember Dr. Lee's requesting to make an autopsy.   I furnished the proofs of death to the defendant company.

Plaintiff thereupon offered in evidence the letter of the Ocean Accident & Guarantee Corporation, dated May 9, 1902, acknowledging receipt from William M. Springer, of No. 1416 F street, Washington, D. C.,  of his letter of May 8, with inclosures.  The inclosures consisting of affidavits or proof of death.

*The witness:*   I have received nothing from the company and am the beneficiary named in the policy of insurance.

On cross-examination witness stated:  Dr. Patterson was also insured in the Mutual Life Insurance Company, of New York.   His application was in March, 1902 ; I furnished proofs of death to that company.   I do not remember the statement I made as to the cause of death, but I signed and made oath to the statement, which I recognize as the one now presented me.

In my affidavit given to the defendant company I stated that about noon on the 28th day of March, my husband, who had been treating a patient in another room, informed me that he had strained himself ; that he became sick, and subsequently died.   In my statement to the Mutual Life Insurance Company the following questions and answers appear:

"*Q.* When did the health of deceased first become to be affected ?   *A.* March 28, 1902.

"*Q.* The duration of his illness? *A.* He died April 10, 1902.

"*Q.* What was the immediate cause of death? *A.* Inflammation of the liver.

"*Q.* Give every particular in relation to the last illness within your knowledge? *A.* Brought about by strain caused by raising a window in an awkward position."

*The witness:* That was the first strain he had, which was on February 20. I don't know why I stated to the Mutual Life Insurance Company that the injury suffered by Dr. Patterson occurred on February 20 from raising a window; it must be a mistake, because he recovered from his first injury. He told me about this injury. I did not see the accident. He did not report this first accident to the Accident Insurance Company, because he did not consider it serious enough. I don't know which patient he was treating when he was hurt, or the name of the patient. He came out in the hall and said, "I have strained myself in a treatment." His language was, "I have just strained myself terribly." He said he was suffering great pain, and both Dr. Smith and myself examined him. I removed his coat and vest, and raised his shirts and examined his flesh in the back. I observed nothing but a tightening of the ligaments of the muscles, and a sore condition. I know it was sore from what he told me. I am an osteopathist, but am not a physician. The injury appeared on the right side, particularly close under the shoulder blade. I gave notice of Dr. Patterson's injury to the defendant on April 7. The officers of the defendant came to the house about fifteen minutes before the funeral and asked to have an autopsy made. I did not give the company any notice of Dr. Patterson's death, but think it was done by friends. I do not know when this notice was given. I think Mr. Boss, who was the agent of the company, gave the notice. The officers of the company asked permission of some members of the family to examine the body, but it was about fifteen minutes before the funeral. My brother told me that they came to the house, but I did not see them. I did not know, before the funeral, that permission to examine the body had

been denied them, but heard it afterwards.    I do not think that my brother came upstairs to consult me while Dr. Johnston and Dr. Glazebrook were downstairs waiting for permission to examine the body, but I do not think it is so.    When these doctors came, people were already coming to the house for the funeral.    I do not know that the defendant company received notice of Dr. Patterson's death only two hours before the funeral.

I received a letter from the agent of the defendant, dated April 13, 1902, which is as follows:

"Dear Madam:

"We were notified of Dr. Patterson's death at 9 : 30 Saturday morning, April 12, 1902.    As Mr. Patterson held an accident policy in this company, we at once sent Dr. Joseph Taber Johnston and Dr. L. W. Glazebrook to your residence to examine the body of Dr. Patterson in respect to the cause of his death, as provided in the policy.    This examination was refused.    The importance of determining absolutely the cause of his death is so great both for you as beneficiary under the policy, and for us, that we are willing to again offer to make such examination.    If you will consent to it, we will arrange the time to suit the physician who represents you, and he will, of course, be entitled to be present at the examination.

"Please let us hear from you in regard to this before 12, noon, Monday, April 14, 1902, so that the examination may be made promptly.    The expense of disinterment and examination will be paid by us.

"If the examination provided by the policy is again refused, we shall disclaim all liability on the policy.

"We are very sorry to be obliged to disturb you in this matter, under the circumstances, but the importance of the matter for us both does not admit of delay.

"Very truly yours,

"Ocean Accident & Guarantee Corporation, Limited,

"By L. O. De Lashmutt,

General Agent for D. C."

*The witness:* I made no reply to this letter personally.    I

have no personal knowledge of any notice of the death being sent to the company, but Mr. Boss, the agent, said it had, and when the doctors asked for permission to examine the body it was refused because we were just ready for the funeral services to begin.   They asked permission afterwards to have the body disinterred, and I did not refuse that outright; of course I objected to it, and when Dr. Nevitt came and asked me about it, I, of course, objected to having it done.

On redirect examination witness said:   I was not seen by any officer of the company personally until after the burial. Dr. Nevitt came to the house on Monday with Mr. De Lashmutt, but the latter did not come in the house.   Dr. Nevitt is coroner of the District.   I did not see the doctors when they called at the house on the day of the funeral, and did not know of the call until after the funeral.

The proof of death given the Mutual Life Insurance Company is not in my handwriting, but I signed it.   I have no recollection of reading it.   I do not know who furnished the information from which the body of the paper is made up.   Judge Springer was my attorney at the time, and I left this matter to him and my brother.   Dr. Nevitt and Mr. De Lashmutt called on Monday, and Dr. Nevitt asked my name and stated that he was the coroner.   I told him my husband had been buried on Saturday in Rock Creek Cemetery.   I did not give him the number of the lot.   He said that he would have to exhume the body for examination, and I said, "Oh, Dr. Nevitt, that is a terrible thing to have to do."   I appealed to him not to do it, and asked if there was no way that it could be avoided.   He said, "Yes; withdraw your claim for $5,000 against the Ocean Accident Company and it will not be done."   And I said, "Well, I would rather not have the $5,000 than have that done, but I cannot tell you what to do until I can see my attorney and brother, as they have charge of my affairs."   He promised me that nothing would be done until he heard further from me. Then he went away.   I did not see him afterwards.

On recross-examination witness said: I made oath to the proof of death furnished the Mutual Life Insurance Company, before the notary, but did not know him personally. I am not familiar with Dr. Lee's handwriting, and don't know who wrote the body of the paper. Dr. Lee was our physician, and he was told of the accident on February 20, as soon as he arrived at the house. He was also told of the accident on March 28. I did not communicate with Dr. Nevitt after he left my house, but my friends attended to those matters for me. I did not instruct anybody to communicate with him.

Thereupon, to further maintain the issues on her part joined, plaintiff recalled Dr. Wilber Smith, who testified as follows: I was at the Patterson house when Drs. Johnston and Glazebrook called. As near as I can remember it was about 10:45, and the funeral was to be held at 11 o'clock. There were about twenty people in the house. I had been standing at the door for some time, and the doctors came into the house and said they had been sent there as representatives of the Accident Insurance Company to hold an autopsy. I told them that it was out of the question, as the funeral services would begin in a few minutes, and that it could not be done. I told them they could step in and look at the body, but they said that it was of no use. They then went away. They had been there only a few minutes. This conversation took place in the hall, and the body was in the parlor. They did not attempt to make an examination. I did not, at that time, tell Mrs. Patterson that the doctors were there. I spoke to her of the probability of an autopsy on the day before, but she had expressed a desire against it. Dr. Lee also spoke to me about it, and I mentioned the subject to her, but it did not agree with her wishes, and was not pressed.

I think Mr. Boss called at the house during Dr. Patterson's illness. I notified him of the injury on April 7, I cannot remember that either Dr. Johnston or Dr. Glazebrook said anything about placing the remains in a vault, and make the examination after the funeral. I don't know when Mr. Boss learned

of Dr. Patterson's death, but I think he called the night before
the funeral. I know that no representative of the company
called at the house to my knowledge between the date of the no-
tice, which was given them, up to about fifteen minutes before
the funeral services began.

On recross-examination witness said: I understood that Mr.
Boss was a special agent of the company; he took my applica-
tion for a policy. I don't know whether you would call him
an insurance broker or not. I know he was a special agent, be-
cause he took my application and he took Dr. Patterson's appli-
cation. His office was with Mr. Wilson, who is the district
agent for the New England Mutual Life Insurance Company.
The Accident Company's office was at Mr. De Lashmutt's office,
which is No. 1421 G street. I knew he was the district agent,
but I did not give him any notice. I remember making checks
for premiums on my policy in this company to Mr. Boss as spe-
cial agent.

When the doctors called at the house on the day of the funeral
and asked leave to make an autopsy, I told them that it could
not be done. The body was in the coffin, but it was not sealed
up. I do not know whether they could have made an examina-
tion of the body, but they could view it.

The only portion of the body that was exposed was the face
and hands. I don't remember that, after declining to permit an
autopsy, the doctors asked that the funeral be permitted to go
on, and that the body be placed in the vault temporarily so that
they could make an examination. I would not deny that such
request was made, and I would not affirm it, because I do not
remember.

Thereupon the plaintiff, to further maintain the issue on her
part joined, recalled William A. Boss, who testified as follows:
I was present at the Patterson house when Drs. Johnston and
Glazebrook called. Dr. Smith met them at the door; they had
some conversation, and in a few minutes they asked if they
could hold an autopsy, and Dr. Smith said no. Then they asked

if they could examine the body. Dr. Smith said they could view the body. That was about 10 : 45. I did not hear them request that the body be placed in a vault, and I would have heard it if such request had been made.

I had made arrangements some time before with Mr. Newton, who was the manager of the Accident Insurance Company, to permit me to write accident insurance for him as special agent; it was a verbal agreement.

The first I heard of Dr. Patterson's injury was about April 7,—I received this notice from Dr. Smith. I forwarded Dr. Smith's letter to Mr. De Lashmutt's office, who was at that time manager of the company. I learned of Dr. Patterson's death on Friday night, read it in the newspaper, and I immediately went to the house. The next morning at 9 o'clock I went to Mr. De Lashmutt's office, and notified him of the death; that was the day of the funeral. He at once telephoned to New York for instructions, and he asked Drs. Johnston and Glazebrook to go to the house. I should say it was between 9 : 30 and 10 o'clock. I don't think the company had any regular medical examiner at that time.

On cross-examination witness said: I do not claim that at that time I was an agent of the company authorized to receive death notices. My duties were to submit accident policies, and I had nothing further to do except to renew the policy when it was due. I was also engaged in the life insurance business and a solicitor of insurance of various kinds.

Dr. Smith's notice was in writing, and I don't recall whether I mailed it to Mr. De Lashmutt or took it to his office. I think I took it there and delivered it to his clerk, but I am not certain about this. I received the notice on April 7, and I think I sent it to Mr. De Lashmutt on the 8th, which was Tuesday. I think Dr. Patterson died Thursday night. I saw it in Friday night's paper, and the next morning notified Mr. De Lashmutt. I could not say that Drs. Johnston and Glazebrook did not request to have the body placed in a vault temporarily, as I do not remember. I was present during the conversation which

took place in the hall between the doctors, and I do not remember Dr. Smith's leaving the hall.

Upon the conclusion of plaintiff's evidence the court sustained a motion to direct a verdict for the defendant, and plaintiff has appealed from the judgment rendered thereon.

*Mr. A. A. Hoehling, Jr.,* and *Mr. Henry F. Woodard* for the appellant.

*Mr. G. E. Hamilton* and *Mr. M. J. Colbert* for the appellee:

1. Where a result or an injury can be traced to several distinct causes, it is not proper to submit to a jury, to be guessed at or conjectured by them, which one of the causes produced the result. There must be some competent evidence to connect the result with the cause complained of, to the exclusion of the other causes. *Barry* v. *United States Acci. Asso.* 23 Fed. 712. See also *Merritt* v. *Accident Co.* 98 Mich. 338; *Anderson* v. *Insurance Co.* 27 Scot. L. R. 20; 1 Am. & Eng. Enc. Law, 2d ed. p. 327; 46 Fed. 446. Where a policy excepted death or injury arising from disease, although accelerated by accident, and it appeared that the insured had suffered from kidney disease, but had not been troubled therewith for a considerable time, and after an accident the disease returned and the insured died, it was held that the insurer was not liable, as the death was within the exception. *Anderson* v. *Insurance Co. supra; McCarthy* v. *Ins. Co.* 8 Biss. 362; *Insurance Co.* v. *McConkey,* 127 U. S. 666; *Tennant* v. *Insurance Co.* 31 Fed. 322; *Cobb* v. *Accident Asso.* 96 Ga. 818; *Menneilley* v. *Employers Co.* 148 N. Y. 596.

2. The beneficiary in this case persistently refused to permit such examination, and this action must defeat a recovery. *Wehle* v. *Accident Asso.* 153 N. Y. 116.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The declarations of the assured, testified to by his wife

and brother-in-law, were properly admitted as tending to show not only that he was then suffering severe bodily pain, but also that he had sustained an accidental strain in the treatment of a patient. They come clearly within the rule of competency, as part of the *res gestœ,* that was enounced by the Supreme Court of the United States in *Travellers' Ins. Co.* v. *Mosley,* 8 Wall. 397, 404, 405, 19 L. ed. 437, 440. See also *Mutual L. Ins. Co.* v. *Hillmon,* 145 U. S. 285, 296, 36 L. ed. 707, 711, 12 Sup. Ct. Rep. 909; *Washington & G. R. Co.* v. *McLane,* 11 App. D. C., 220, 222.

The statements made by the assured to his attending physician, on the day after the alleged accident, tending to show his bodily pain, the particular location of the same, and the symptoms of his malady were also properly admitted. *Northern P. R. Co.* v. *Urlin,* 158 U. S. 271, 274, 39 L. ed. 977, 981, 15 Sup. Ct. Rep. 840.

But it was not error to exclude his statements then made to the physician, tending to show that he had received a strain on the day before, to which he attributed his condition. This was too long after the occurrence to be admissible as part of the *res gestœ* under the rule of the cases before cited.

2. The case was withdrawn from the jury on the ground that the evidence offered by the plaintiff was not sufficient, as matter of law, to establish liability on the part of the defendant.

(1) The first question is, Was the evidence sufficient to require submission to the jury to determine whether the assured sustained an accident on March 28, and, if so, whether the same was the actual and direct cause of his death within the meaning of the policy?

The evidence plainly tended to show that prior to March 28 the assured had been a strong, vigorous, and apparently healthy man; and that on that day he sustained an accidental strain which gave him severe bodily pain and caused the cessation of his labors. The existence of these facts depended upon the credibility of the witnesses testifying thereto and the weight of their evidence, both of which were within the exclusive province of the jury.

(2) The evidence tending to show that the assured continued to suffer great pain in the same parts of the body until his death, about ten days thereafter, was strong and undisputed.

The evidence tending to show that the accidental strain caused the rupture of some ligaments or tissue connected with the liver, or the rupture of the gall bladder or bile duct, thereby becoming the actual, efficient cause of death, is undoubtedly weak, but we are not prepared to say that it was so plainly insufficient as to warrant its withdrawal from the consideration of the jury. Doubting whether all reasonable men must necessarily come to the one conclusion therefrom, that plaintiff had failed to make out a case of death resulting from accident, we are constrained to resolve that doubt in favor of trial by jury. The rule in ordinary cases is that what is the proximate cause of an injury is generally a question for the jury, to be determined as a fact in view of all the circumstances of fact attending it. *Milwaukee & St. P. R. Co.* v. *Kellogg,* 94 U. S. 469, 474, 476, 24 L. ed. 256, 259; *Guenther* v. *Metropolitan R. Co.* 23 App. D. C. 493, 510.

Were this an action of damages against a wrongdoer for death resulting from an injury caused by wilful or negligent act, the defendant could not escape liability on the mere ground that before the accident there was an existing malady or diseased condition of the liver, gall bladder, or bile duct of the deceased, and that death resulted or was hastened because the injury aggravated the effects of that disease, or the disease aggravated the effects of the injury. The liability exists in such cases if the injury is the predominant, efficient cause of the death, notwithstanding it would not have naturally produced death if there had been no such pre-existing disease. *Guenther* v. *Metropolitan R. Co.* 23 App. D. C. 493, 515, 516. That the rule in that case might not be regarded as intended to extend to a case of contract, which was not there involved, it was said: "Whatever the rule may be in an action depending upon the construction of a contract of insurance against accident, under certain limitations and exceptions, as to liability where the death was from disease 'aggravated and made fatal' by accident, we

do not think it can apply in an action of tort for the benefit of a wrongdoer." ˙

(3) It remains, now, to consider the question in the light of the stipulations of the contract upon which the action is maintained.

By the first of these the insurance is expressly stated to be, "against accidental bodily injuries caused solely  *  *  *  by external, violent and visible means which shall, independently of all other causes, disable the assured."

That a strain received in the ordinary course of the assured's business, if received at all, is an accident within the contemplation of the policy we can have no doubt. *United States Mut. Acci. Asso.* v. *Barry,* 131 U. S. 100, 121, 33 L. ed. 60, 67, 9 Sup. Ct. Rep. 755.

The universal rule of interpretation of contracts of insurance of all kinds is that in cases of doubt, that interpretation shall be given which favors the insured rather than the insurer. The particular words quoted would seem to have been intended particularly to apply to a case of disability for which the assured might claim the indemnity stipulated in the policy. But assuming that they were expressly intended to apply to the death indemnity clause, and be read in connection with the words therein providing that death shall result from accidental bodily injuries as the "actual and direct cause thereof," we think they cannot be regarded as clearly meaning that there shall be no recovery in a case where there was a pre-existing diseased condition of the body,—a predisposing cause of death, as it has been called,—notwithstanding the accidental injury may have been the exciting, efficient, predominant cause.

Their meaning, considering them together or separately, is, in our opinion, that the intervening accident must be the proximate, direct cause of death, and nothing more. This conclusion is supported by the following authorities: *Fetter* v. *Fidelity & C. Co.* 174 Mo. 256, 61 L. R. A. 459, 97 Am. St. Rep. 560, 73 S. W. 592; *Horsfall* v. *Pacific Mut. L. Ins. Co.* 32 Wash. 132, 63 L. R. A. 425, 98 Am. St. Rep. 846, 72 Pac. 1028; *Modern Woodman Acci. Asso.* v. *Shryock,* 54 Neb. 250,

39 L. R. A. 826, 74 N. W. 607; *Freeman* v. *Mercantile Mut. Acci. Asso.* 156 Mass. 351, 353, 17 L. R. A. 753, 30 N. E. 1013. See also *Winspear* v. *Accident Ins. Co.* L. R. 6 Q. B. Div. 42, 45; *Travelers' Ins. Co.* v. *Murray,* 16 Colo. 296, 25 Am. St. Rep. 267, 26 Pac. 774; *Atlanta Acci. Asso.* v. *Alexander,* 104 Ga. 709, 42 L. R. A. 188, 30 S. E. 939; *Omberg* v. *United States Mut. Acci. Asso.* 101 Ky. 303, 72 Am. St. Rep. 413, 40 S. W. 909.

The doctrine is well expressed by the supreme judicial court of Massachusetts, in *Freeman* v. *Mercantile Mut. Acci. Asso.* 156 Mass. 351, 17 L. R. A. 753, 30 N. E. 1013, in the following words: "The law will not go farther back in the line of causation than to find the active, efficient, procuring cause of which the event under consideration is the natural and probable consequence, in view of the existing circumstances and conditions. * * * An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so as well when death comes through the medium of a disease directly induced by the injury, as when the injury immediately interrupts the vital processes."

It is true that there are cases of highly respectable authority, some of which directly and others indirectly support the contention of the appellee. These have been carefully examined, but we shall not review them, as that has been done in a satisfactory manner by the supreme court of Nebraska, in *Modern Woodman Acci. Asso.* v. *Shryock,* 54 Neb. 250, 39 L. R. A. 826, 74 N. W. 607. It may be remarked, however, that the able opinion in the case of *National Masonic Acci. Asso.* v. *Shryock,* 20 C. C. A. 3, 36 U S. App. 658, 73 Fed. 774, upon which the appellee strongly relies, is founded upon the terms of a policy quite different from that involved in this case. Therein it was expressly stipulated that the insurance does not cover "death or disability resulting wholly or in part, directly or indirectly, from any of the following causes: * * * disease or bodily infirmity. * * *"

Other provisions of this policy tend to confirm our view of the interpretation of the words before quoted. The assured was required to answer whether his hearing or vision was impaired, and whether he had ever had or been subject to fits or diseases of the brain. His negative answers thereto were declared to be special warranties, the untruth of which, in any respect, would render the policy null and void. It is reasonable to presume, therefore, that an affirmative answer to any one of these questions would have resulted in the denial of the policy. If, then, it was the intention of the insurer not to become liable in the event that an accident should result from any other malady or unknown infirmity, or in the event that a pre-existing malady, uninquired of, and probably unknown to the assured, should be developed and brought into sudden operation by an accidental injury, and produce death, why was it not expressly provided for, also, in the policy, and brought to the actual knowledge of the assured? Again, this form of policy was intended for the insurance of women as well as men, and, as we have seen, expressly stipulates that it shall not cover "death or injury to a woman wholly or in part attributable to child-birth or pregnancy, although such death or injury may have been accelerated by accident." If the construction of the previous provision contended for by appellee is the correct one, this stipulation is unnecessary and unimportant. If not, its materiality and importance are obvious.

The insurer writes its contracts, and its agents are expressly forbidden the power to alter any of their terms or waive any of their conditions without the consent in writing of its general manager. It is eminently just, therefore, that it should not be permitted to escape liability through any limitation thereof not fairly and reasonably disclosed by the terms and conditions of the contract to those soliciting insurance or accepting it at the solicitation of the insurer's agents.

3. The last question for consideration arises under the clause of the policy which provides that "any medical adviser of the corporation shall have the right and opportunity, as often as he may require, to examine the person or body of the assured in

respect to alleged injury or cause of death, and any refusal on the part of the assured, or of the beneficiary, or of the legal representatives of the assured, to comply with this provision, shall operate to defeat the policy."

We are not advised that the withdrawal of the case from the jury was founded on the evidence relating to the defense under this clause, but it presents a question that must necessarily be determined in view of the new trial that will be awarded.

We cannot agree with the general contention of the appellee that this right to examine the body includes also the right of autopsy or dissection, much less exhumation, for that purpose.

As heretofore remarked, where there is any doubt as to the meaning of the terms and conditions of a contract of insurance, it is to be resolved in favor of the assured; and this rule of construction has its strongest application in relation to those that would work the forfeiture of a right otherwise maintainable. It is also a reasonable and well-established rule of interpretation that the terms used are to be understood in their ordinary and popular sense. Whatever meaning the word "examine," in relation to the body of a deceased person, might convey to medical experts, we think it clear that, in popular understanding, it does not include the right of dissection.

The prejudice, if it may be so called, which so generally prevails, and especially among the relations and friends of a deceased person, against the submission of the body to dissection, would doubtless prevent many persons from accepting insurance containing an express condition extending that right to the insurer if considered material for his protection. *Sudduth* v. *Travelers' Ins. Co.* 106 Fed. 822; *Ewing* v. *Commercial Travelers' Mut. Acci. Asso.* 55 App. Div. 241, 66 N. Y. Supp. 1056, 170 N. Y. 590, 63 N. E. 1116.

It would seem from the evidence before recited, that the purpose of the insurer was not to view or examine the appearance of the body merely, but to dissect the same. If the question be raised upon another trial it will be the duty of the court to instruct the jury in accordance with this view of the effect of the clause under consideration, and to submit to them the single

question whether, upon demand reasonably made therefor, the plaintiff, or those acting for her, refused to permit the medical advisers of the insurer to examine the body in the sense of that word as here given. A failure to extend that permission, upon demand made at a reasonable time and place before burial, would bar recovery upon the policy.

For the reasons given, the judgment will be reversed, with costs, and the cause remanded with direction to award a new trial. It is so ordered.                              *Reversed.*