## PRUDENTIAL INS. CO. OF AMERICA v. BECKWITH.
### No. 6774.

United States Court of Appeals for the District of Columbia.
Decided April 19, 1937.

Benjamin S. Minor, H. Prescott Gatley, and Arthur P. Drury, all of Washington, D. C., for appellant.

Harry L. Ryan, Jr., of Washington, D. D., for appellee.

Before MARTIN, Chief Justice, and ROBB, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

This is a proceeding in error to the Municipal Court of the District of Columbia for a review of certain judgments of that court rendered in favor of the claimant under two several policies of insurance.

The record contains the following agreed statement of facts covering both cases:

That on December 29, 1924, the defendant insurance company issued a policy on the life of Elmer R. Beckwith, whereby it agreed to pay to his executor or administrator or other person equitably entitled thereto, the sum of $445, upon receipt of due proof of the death of the insured while the policy was in force. On December 3, 1928, the insurance company issued its further policy of insurance on the life of Beckwith whereby it agreed to pay to his executors or administrators the sum of $160, upon receipt of due proof of the death of the insured while the policy was in force.

Afterwards, to wit, on December 10, 1928, certain provisions were added to each of the aforesaid policies providing for the payment of additional benefits in the event of the death of the insured caused by accidental means as defined by the following provisions, to wit:

"Upon receipt of due proof that the Insured after attainment of age 15 and prior to the attainment of age 70, has sustained bodily injury, solely through external, violent and accidental means, occurring after the date of the Policy (but in no case prior to December 10, 1928) and resulting in the death of the insured within ninety days from the date of such bodily injury while the Policy is in force, and while there is no default in the payment of premium, the Company will pay in addition to any other sums due under the Policy and subject to the provisions of the Policy an Accidental Death Benefit equal to the face amount of insurance stated in the policy less the amount

of any disability benefit which has become payable under the Policy on account of the same bodily injury. * * *"

The death of the insured, Elmer R. Beckwith, occurred on August 7, 1934, under the following circumstances:

"Beckwith, a plumber by trade, was employed by Thomas E. Clark, Incorporated. On the morning of August 7, 1934, Beckwith and one Joseph E. Clark went to the dwelling at 4530 9th Street, Northwest, in the District of Columbia, for the purpose of replacing an old bathtub located in the bathroom on the second floor of that building. Beckwith and Clark disconnected the old tub, which weighed about 250 pounds, carried it down the flight of steps to the first floor, down a few more steps from the front porch, and to the back of the house where the new tub had been delivered. In carrying this tub Beckwith was on the back end and Clark was on the front end. They put the tub down several times and rested and when the tub was finally put down in the yard Beckwith remained with it while Clark took some tools back to the bathroom. When Clark returned he and Beckwith carried the new tub, which weighed about the same as the old tub, from the yard up the porch steps and up the flight to the second floor. In carrying this tub the position of the men was the same as before, which meant that Beckwith carried the front end and Clark carried the back end. The tub was put down several times for rests and when the second floor was reached the tub was set down on the landing at the top of the steps and Beckwith and Clark went into the bathroom and moved some tools where they wanted them. Beckwith then sat down on the stool in the bathroom and gasped for breath and looked so peculiar that Clark and two ladies in the house helped him from the bathroom to a bedroom where he lay down and was given some ammonia. This spell or attack occurred within five minutes or less from the time they reached the landing with the tub. After laying on the bed for a short while Beckwith revived, got up and helped Clark carry the tub from the landing, into the bathroom, and when the tub was set down there he again sat on the stool. All this time Clark noticed that Beckwith was looking and acting 'funny'. A few moments later Beckwith collapsed and fell from the stool and lay on the floor face up, very purple and gasping for breath. Clark and the two ladies again did what they could and called a doctor, but Beckwith was dead before the doctor arrived. This second attack or spell took place not longer than five minutes after he had assisted moving the tub from the landing into the bathroom.

"During the course of this whole work there was no mishap of any kind, such as stumbling, slipping, falling or dropping the tub, no undue strain was thrown on either Beckwith or Clark, other than the ordinary strain of weight carrying. It was the usual custom of Beckwith's employer to have colored help to carry tubs in and out of premises on jobs such as was undertaken in the present instance, and this was the only occasion during his entire period of employment that the deceased had ever had to carry or assist in carrying a tub. Clark, the co-employee, in ordinary good health, considered the carrying of these tubs considerable strain on himself. The strain in carrying the tubs upstairs was considerably greater than in carrying them on the level, and Clark felt the results of it.

"On the same day August 7, 1934, the coroner for the District of Columbia performed an autopsy on the body of Beckwith and his findings with respect to his heart were: 'Hypertrophied (or enlarged) systole (part of the heart), advanced adherent pericarditis, left ventricle and auricle adherent to pericardium, myoendocarditis (inflammation of the membraneous lining of the muscular part of the wall of the heart), chicken clots in chambers.' The various other organs were found to be in a congested condition. His general condition was stated to be good. The coroner found that the cause of death was chronic myo-endocarditis, and his certificate to that effect was filed by him with the Public Health Department of the District of Columbia, and a certified copy thereof may be received in evidence upon the offer of either party hereto. At the time of his death Beckwith was thirty-three years of age.

"The acute onset of the heart disease (chronic myo-endocarditis) from which Beckwith died, could, in the opinion of two doctors, one of whom saw him immediately after his death, have been precipitated by the labor of carrying the tubs hereinbefore mentioned, and both doctors consider the carrying of the same to be

undue stress and strain upon the decedent, and to be the precipitating cause of the immediate attack. They further believe that had Beckwith not undergone any undue stress or strain he could have continued indefinitely in his ordinary labors. Decedent's condition was not in the advanced stages of myo-endocarditis, and the term chronic is 'flexible'; there being various stages of 'chronic' from mild to severe, and this man's condition was not severely chronic. He could have carried on a number of years and not died. It is also possible that with his condition of heart, as disclosed by the autopsy he could have had an acute attack and died without undergoing any undue stress or strain, but it is considered improbable, at his age. Decedent had been married fourteen years and during the entire period the only occasion he was ever ill was about six years prior to his death when he had an attack of the grippe; he had never suffered or complained of any heart condition."

It is not denied that the policies were in force and effect at the time of the insured's death; and that due proof of the insured's death was regularly submitted to the company under the provisions of the policies. The sole question arising in the case is whether the insured "sustained bodily injury solely through external, violent and accidental means" resulting in his death.

We are of the opinion upon the agreed statement of facts that the death of the insured did not result from "bodily injury solely through external, violent and accidental means."

In the case of Landress v. Phoenix Mutual Life Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 462, 78 L.Ed. 934, 90 A.L.R. 1382, it appeared that the insured, while playing golf, suffered a sun stroke from which he died. The petitioner sought a recovery of the amounts stipulated in one policy to be paid if death should result "directly and independently of all other causes from bodily injuries effected through external, violent and accidental means, and not directly or indirectly, wholly or partly from disease or physical or mental infirmity," and in the other policy, if death should result "from bodily injuries effected directly and independently of all other causes through external, violent and accidental means."

It appears that the deceased, while in good health and while playing golf in his accustomed manner at a place where many others were playing without injury, was suddenly and unexpectedly overcome from the force of the sun's rays upon his head and body and that shortly afterwards he died; that an autopsy revealed that there was no bodily infirmity or disease which could have been a contributing cause of his death. The petitioner argued that the death of the insured, resulting from voluntary exposure to the sun's rays under normal conditions, was accidental in the common or popular sense of the term and should therefore be held to be within the liability clauses of the policies. The court, however, denied the petitioner's contention and held that " * * * it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident,' see Lewis v. Ocean Accident & G. Corp., 224 N.Y. 18, 21, 120 N.E. 56, 57, 7 A.L.R. 1129; see, also, Aetna Life Ins. Co. v. Portland Gas & Coke Co. (C.C.A.) 229 F. 552, L.R.A. 1916D, 1027, for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated to be the rays of the sun, to which the insured voluntarily exposed himself. Petitioner's pleadings do not suggest that there was anything in the sun's rays, the weather, or other circumstances external to the insured's own body and operating to produce the unanticipated injury, which was unknown or unforeseen by the insured. * * *

"In U. S. Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 759, 33 L.Ed. 60, the insured suffered an internal injury caused by his jumping voluntarily from a platform to the ground, a distance of four or five feet. Recovery was allowed of amounts stipulated by the policy to be paid upon proof of bodily injury 'effected through external, violent, and accidental means.' There was evidence from which the jury might have

inferred that the insured alighted in the manner not intended, causing a jar or shock of unexpected severity. This Court held that the trial judge correctly left to the jury the question whether the insured jumped or alighted in the manner he intended, and properly charged that, if he did not, it might find that the injury was caused by accidental means, pages 109, 110, 121 of 131 U.S., 9 S.Ct. 755, 759.

"This distinction between accidental external means and accidental result has been generally recognized and applied where the stipulated liability is for injury resulting from an accidental external means. See Aetna Life Ins. Co. v. Brand (C.C.A.) 265 F. 6, 13 A.L.R. 657; Lincoln National Ins. Co. v. Erickson (C.C.A.) 42 F.(2d) 997; Jensma v. Sun Life Assur. Co. [(C.C.A.) 64 F.(2d) 457] supra; Order of United Commercial Travelers v. Shane (C.C.A.) 64 F.(2d) 55; contra, Mutual Life Ins. Co. v. Dodge (C. C.A.) 11 F.(2d) 486, 59 A.L.R. 1290."

In the U. S. Mutual Accident Ass'n v. Barry, cited with approval in the foregoing opinion, it appears that the deceased together with two other persons jumped from a platform four or five feet high to the ground; that he soon appeared ill and vomited, and could retain nothing on his stomach, and passed nothing but decomposed blood and mucus and died nine days afterwards. It was averred that the jar from the jump produced a stricture of the duodenum, from the effects of which death ensued. The insured's policy provided for payment in case of death resulting from "bodily injuries effected through external, violent and accidental means." The trial court in charging the jury spoke as follows:

"If you find that injury was sustained, then the next question is: Was it effected through external, violent, and accidental means? This is a pivotal point in the case, and therefore vitally important. The means must have been external, violent, and accidental. Did an accident occur in the means through which the alleged bodily injury was effected?

"The jumping off the platform was the means by which the injury, if any was sustained, was caused.

"Now, was there anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground?

"The term 'accidental' is here used in its ordinary, popular sense, and in that sense it means 'happening by chance; unexpectedly taking place; not according to the usual course of things'; or not as expected.

"In other words, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, then, I suppose, it cannot be called a result effected by accidental means.

"But if in the act which precedes the injury something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted from the accident, or through accidental means.

"We understand from the testimony, without question, that the deceased jumped from the platform with his eyes open, for his own convenience, in the free exercise of his choice, and not from any perilous necessity. He encountered no obstacle in jumping, and he alighted on the ground in an erect posture. So far we proceed without difficulty; but you must go further and inquire, and here is the precise point on which the question turns: Was there or not any unexpected or unforeseen or involuntary movement of the body, from the time Dr. Barry left the platform until he reached the ground, or in the act of alighting? Did he or not alight on the ground just as he intended to do? Did he accomplish just what he intended to, in the way he intended to? Did he or not unexpectedly lose or relax his self-control, in his downward movement? Did his feet strike the ground as he intended or expected, or did they not? Did he or not miscalculate the distance, and was there or not any involuntary turning of the body in the downward movement, or in the act of alighting on the ground? These are points directly pertinent to the question in hand."

These instructions were in effect approved by the Supreme Court in Landress v. Phoenix Insurance Co., supra.

In Shanberg v. Fidelity & Casualty Co. (C.C.A.) 158 F. 1, 4, 19 L.R.A.(N.S.) 1206, the insured was engaged with another man in carrying a cellar door from one building to another. When they arrived at their destination and set the door down, the insured said that he was tired

and fell dead. There was no slip or stumble while they were carrying the door, and an autopsy disclosed that the insured had fatty degeneration of the heart, and that the strain of carrying the door ruptured it causing his death. The policy insured against death "resulting directly and independently of all other causes, from bodily injuries sustained through external, violent and accidental means." The court held that there was no accident in the means through which the bodily injury was effected, and said:

"It would not help the matter to call the injury itself—that is, the rupture of the heart—an accident... That was the result, and not the means through which it was effected. Carrying the door, or, after putting it down, the act of filling his lungs with air by drawing a long breath, was the means by which the injury was caused. Both were done by the assured voluntarily, and in an ordinary way with no unforeseen, accidental, or involuntary movement of the body whatever. There was no stumbling, slipping, or falling; there was nothing accidental in his movements, any more than there would be in walking on the street, or passing down the steps of his house, during each of which he might have filled his lungs by drawing a long breath, and ruptured his heart. * * * Had the assured, while assisting in carrying the door, lost his balance and fallen and struck upon some unforeseen object, or slipped on the ice, his death might be said to have resulted from violent or accidental means, and, assuming that there was no want of due diligence on his part, would doubtless be covered by the policy. But from the facts as disclosed by the record in this case, we do not think it can be said that the rupture of the assured's heart, and which caused his death, was in any sense the result of an accident. He engaged in carrying this door for his own convenience; he encountered no obstacle in doing so; he accomplished just what he intended to, in the way he intended to, and in the free exercise of his choice. No accident of any kind interfered with his movements, or for an instant relaxed his self-control."

We have been cited to Patterson v. Ocean Accident & G. Corporation, 25 App.D.C. 46, by the appellee, but in our opinion the case differs from the case now before the court. The assured in that case was engaged as an osteopath. While treating a patient in his offices one day, he strained himself in some way unknown to himself, except that it occurred while he was manipulating or turning the patient. He was insured "against accidental bodily injuries caused solely * * * by external, violent and visible means which shall, independently of all other causes, disable the assured."

It was held by the court:

"* * * That a strain received in the ordinary course of the assured's business, if received at all, is an accident within the contemplation of the policy we can have no doubt. United States Mut. Accident Ass'n v. Barry, 131 U.S. 100, 121, 9 S.Ct. 755, 33 L.Ed. 60, 67."

It appears therefore that this court's opinion in the foregoing case is consistent with Landress v. Phoenix Mutual Life Ins. Co., supra, for in the case just cited the osteopath suffered a mishap or accident while treating his patient, which mishap or accident was the means causing his death.

It may be observed again that when the insured and Clark carried the tub in the manner described in the agreed statement of facts there was no mishap of any kind, such as slipping, falling, or dropping the tub, no undue strain was thrown on either Beckwith or Clark, other than the ordinary strain of weight carrying. It follows that this strain caused the death of Beckwith, but it was not an accidental strain nor did it result in anywise from an accidental cause. It is true that the insured's death might be referred to as an accident, but, as stated by Mr. Justice Stone in Landress v. Phoenix Mutual Life Ins. Co., supra, the means was not accidental, and accordingly no accident happened within the purview of the policies.

The judgment of the municipal court is therefore reversed and the cause is remanded with directions to dismiss the case upon the agreed statement of facts.

Reversed.

STEPHENS, Associate Justice.

I concur in the result, but I dissent from that part of the opinion which purports to distinguish Patterson v. Ocean A. & G. Corporation, 25 App.D.C. 46. The majority rules in the instant case, and I think correctly, under Land-

ress v. Phoenix Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382, and Shanberg v. Fidelity & Casualty Co. (C.C.A.) 158 F. 1, 19 L.R.A.(N.S.) 1206, cited in the majority opinion, that a distinction must be drawn under the policy wording between the means and the result, and that it is the former, not the latter, which must be accidental. And it is therefore concluded that as there was nothing accidental about the carrying, or the manner of carrying, the bathtub by the plumber, there can be no recovery for the resultant heart strain and death. In the Patterson Case an osteopath, while manipulating a patient, received a strain, presumably to the liver, resulting in death. There was nothing indicating that there was anything accidental about the manipulating or the manner of manipulating, the patient. Yet there the court held that recovery was proper under the policy. The cases seem to me identical on the facts, but in the instant case the majority opinion treats the carrying of the bathtub as the means and the heart strain and death as the result, whereas in the Patterson Case it treats the strain as the means and the death as the result. I think it the court's duty, in order that the law in this jurisdiction may be certain on the subject involved, to recognize expressly that the Patterson Case is wrongly decided and overrule it. I am aware that the Patterson Case was decided upon the faith of Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60, discussed in the majority opinion, but I think the decision in the Patterson Case was wrongly based on the Barry Case. In the latter the injury resulting in death occurred as a result of a jump to the ground from a platform four or five feet high. The Supreme Court held, consistently with its later holding in Landress v. Phoenix Ins. Co., supra, that it was the means which must be accidental. There was nothing accidental about jumping from the platform—that was a voluntary act; but the trial court there had left it to the jury to determine whether or not after the deceased left the platform, or in the act of alighting, there was some unexpected or unforeseen or involuntary movement. This clearly distinguishes the Barry Case from the Patterson Case, for in the latter, where the verdict was directed by the trial court in the plaintiff's favor, there was nothing in the evidence to indicate that, after the osteopath had commenced to manipulate the patient, obviously a voluntary act, some unexpected or unforeseen or involuntary movement occurred.

I am authorized to state that Judge GRONER concurs in this separate opinion.