998 F.2d 1016
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Sue SILVEST, Guardian of the Estates of Suanne Silvest and
Jill Elizabeth Silvest, minors, Plaintiff-Appellant,
v.
MONUMENTAL GENERAL INSURANCE COMPANY, a Maryland
corporation, Defendant-Appellee.
 No. 92-3336.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 24, 1993.
Decided July 9, 1993.
 
 Appeal from the United States District Court for the Northern District of Illinois, Western Division, No. 91 C 20050, Philip G. Reinhard, Judge.
 AFFIRMED.
 Before BAUER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Dr. George Silvest's life was insured against accidental death under a group insurance policy issued by Monumental General Insurance Company. At Dr. Silvest's death, Monumental General denied coverage. Sue Silvest, as guardian of the estates of her minor children, (the Guardian) brought a diversity action against the insurer on behalf of the named policy beneficiaries. The district court found that Dr. Silvest's death was not covered under the terms of the policy and entered summary judgment for Monumental General. The Guardian now appeals the judgment of the district court. For the reasons stated below, we affirm.
 
 
 2
 * BACKGROUND
 
 A. FACTS
 
 3
 On February 5, 1988, Dr. Silvest was admitted to the emergency room of St. Thomas Hospital on the island of St. Thomas in the United States Virgin Islands. Dr. Pamela Medley was the emergency room physician. After receiving information from people who knew Dr. Silvest, Dr. Medley ascertained that Dr. Silvest suffered from manic depression as well as possible substance abuse. In a medical bag that Dr. Silvest had brought with him to the hospital, Dr. Medley found, among other items, a bottle that should have contained 100 Quaaludes. Upon examination, she discovered that only seventy-five pills remained in the bottle. Dr. Medley then diagnosed Dr. Silvest as being in a manic state, as intoxicated, and as under the influence of Quaaludes. She admitted him to the neuropsychiatric unit of the hospital.
 
 
 4
 In the course of her duties, Dr. Medley checked on Dr. Silvest several times after he had been admitted and she believed that his only concern was whether she would interfere with his manic high. The next morning, February 6, 1988, Dr. Silvest signed himself out of the hospital. When he left the hospital, he took his personal belongings, including his medical bag, with him.
 
 
 5
 On February 9, 1988, Dr. Medley was again assigned to the emergency room when Dr. Silvest arrived in an ambulance. He was unconscious, he had a head injury, and he had numerous bruises and abrasions on his body. Dr. Silvest's medical bag was brought with him. Dr. Medley searched the bag, but discovered that the bottle of Quaaludes was gone. She determined that Dr. Silvest had ingested approximately seventy-five Quaaludes after leaving the hospital on February 6. Dr. Silvest did not recover; he died that same day.
 
 
 6
 At the autopsy, the contents of Dr. Silvest's stomach were examined. The contents looked like brown mud containing white, chalky bits, and the doctors present commented that it appeared Dr. Silvest had swallowed numerous Quaaludes. A bottle cap and shards of glass were also found in his stomach. Dr. Medley did not believe that Dr. Silvest had committed suicide. She believed that he had left the hospital intent on maintaining a drug-induced manic high and had inadvertently overdosed, possibly while ingesting alcohol. The certificate of death issued by the Department of Health of the Virgin Islands of the United States stated that death was caused by: "(a) Cardio Respiratory Arrest Due To, Or As A Consequence Of: (b) Probable Drug Abuse And Over Dosage Due To, Or As A Consequence Of: (c) Chronic Mental Disorder Treated." R. 26 at Ex. A.
 
 
 7
 At the time of his death, Dr. Silvest's life was insured under a group insurance policy issued by Monumental General. The policy provided for $150,000 of accidental death or loss of use benefits. Section B of the master policy defines "injury" as
 
 
 8
 a bodily injury resulting directly and independently of all other causes from an accident, occurring while this Policy is in force as to a Covered Person whose injury is the basis of a claim hereunder, and which is not caused or contributed to by illness or disease.
 
 
 9
 R. 26 at Ex. D (emphasis added). Accidental death benefits are provided in Section E of the master policy. This section states that
 
 
 10
 [u]pon receipt of due proof that a Covered Person while insured for Accidental Death Benefits under the policy has sustained an accidental bodily injury and that such injury has resulted, within 365 days after the date of its occurrence and without other contributing cause, in the death of the Covered Person, the Insurer will pay to the Beneficiary the Principal Sum specified in the Schedule of Benefits.
 
 
 11
 R. 26 at Ex. D. The master policy also states that "[t]his policy is issued in the District of Columbia and is subject to the laws of the jurisdiction." Id. Although a copy of the master policy was not provided to Dr. Silvest, he did possess a certificate of coverage. The certificate does not contain the choice of law provision included in the master policy. It does, however, note on the title page that
 
 
 12
 [c]ertain provisions of the policy are summarized on this and the following pages. Such description defines in general terms the insurance under the group policy, but does not constitute a waiver of any of its terms and conditions, all of which are controlling.
 
 
 13
 R. 1 at 4. The rest of the certificate is substantially similar to the master policy.
 
 
 14
 After Dr. Silvest's death, the Guardian attempted to collect on the policy. Monumental General, however, disclaimed coverage and refused to pay out any proceeds. It claimed that Dr. Silvest's death was not covered under the terms of the policy.
 
 B. District Court Proceedings
 
 15
 Basing jurisdiction on diversity of citizenship, the Guardian filed an action against Monumental General in federal district court. The first count of the complaint alleged that policy coverage existed and that Monumental General was liable to the beneficiaries for $150,000. The second count alleged that, because Monumental General had engaged in vexatious and unreasonable delay in settling the claim, claimants were entitled to attorneys' fees and penalties against the insurer under the Illinois Insurance Code. See Ill.Ann.Stat. ch. 73, para. 767 (Smith-Hurd Supp.1992).
 
 
 16
 The district court granted summary judgment for Monumental General. It held that Dr. Silvest's death was not covered under the insurance policy. The court found that the law of the District of Columbia applied to the policy and, under that law, Dr. Silvest's death was not accidental within the meaning of the policy terms. Furthermore, because District of Columbia law applied to the claim, the court held that no cause of action existed under the Illinois Insurance Code against Monumental General for its alleged vexatious delay in settling the claim.
 
 
 17
 The Guardian then moved to have the judgment altered or amended, but the district court denied that motion. She now appeals the judgment. She submits that Illinois law applies to the policy held by Dr. Silvest; that, regardless of which forum's law is applied, Dr. Silvest's death is covered by the policy; and that the Illinois Insurance Code applies to Monumental General. For the reasons stated below, we affirm the judgment of the district court.
 
 II
 ANALYSIS
 
 18
 We review de novo a district court's grant of summary judgment. La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 905 (7th Cir.1990). We must view the record and all inferences drawn from it in the light most favorable to the non-movant. Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir.1990). Only reasonable inferences, however, need be drawn from the facts. Hermes v. Hein, 742 F.2d 350, 353 (7th Cir.1984). Additionally, "we may affirm a district court's ruling on any grounds supported by the record." McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686 n. 1 (7th Cir.1991).
 
 A. Law Governing the Policy
 
 19
 The Guardian asserts that the law of Illinois and not that of the District of Columbia should govern the interpretation of the insurance policy held by Dr. Silvest. Her main contention is that the certificate held by Dr. Silvest does not contain the choice of law provision found in the master group policy.[1] She claims that application of the law of the District of Columbia under these circumstances violates Illinois' public policy because an insured does not realize that a different, perhaps more restrictive, law may apply under the language of the master policy.
 
 
 20
 In order to resolve this question, we must apply Illinois' choice of law rules. "In diversity cases, federal courts apply the substantive law of the state where the suit is brought, including the state's choice of law rules." Heller Int'l Corp. v. Sharp, 974 F.2d 850, 856 (7th Cir.1992). In Hofeld v. Nationwide Life Insurance Co., 322 N.E.2d 454, 460 (Ill.1975), the Illinois Supreme Court held that a choice of law provision inserted in the basic group policy generally will be given effect even if that provision does not appear in the insured's certificate. "The master policy is the primary contract and must first be looked to in construing group insurance policies." Id. at 457.[2] Thus, as long as the choice of law provision to be applied does not conflict with the public policy of Illinois and the certificate does not contain a provision that conflicts with the master policy, the master policy's provision will be applied. Id. at 460; Swanberg v. Mutual Benefit Life Ins. Co., 398 N.E.2d 299, 301 (Ill.App.Ct.1979). As in Hofeld, there is no conflict between the language of Dr. Silvest's certificate and that of the master policy. The certificate is silent on the issue of choice of law; therefore, the provision in the master policy controls. Furthermore, as demonstrated in Hofeld and contrary to the Guardian's contention, application of the provision does not violate the public policy of Illinois merely because the choice of law language is not present in the certificate. "The insured normally must be charged with the knowledge of the terms of the master policy." Hofeld, 322 N.E.2d at 457. This result is not changed merely because District of Columbia insurance law may be more restrictive than the law of Illinois and thus mandate a different result.[3] Thus, we agree with the district court that the law of the District of Columbia applies to this insurance claim.
 
 
 21
 B. Coverage for Accidental Death Under the Law of the District of Columbia
 
 
 22
 The parties do not dispute that the District of Columbia distinguishes between death that is accidental in the sense that it is unintended and unforeseen but caused by volitional acts of the decedent, and death caused by accidental means. See Smith v. Continental Casualty Co., 203 A.2d 168, 169-70 (D.C.1964); see also Lamb v. Northwestern Nat'l Life Ins. Co., 467 A.2d 182, 186 (Md.Ct.Spec.App.1983) (construing District of Columbia law regarding accidental death). Only deaths caused by accidental means are deemed "accidental injuries"; death resulting from a voluntary act is not deemed accidental. See, e.g., Smith, 203 A.2d at 169 (holding that workman who had heart attack after climbing up and down an embankment did not die by accidental means); Prudential Ins. Co. v. Beckwith, 91 F.2d 240 (D.C.Cir.1937) (stating that an insured who carried a bathtub up several flights of stairs and then suffered a heart attack was not covered under accidental injury provision of insurance policy). Thus, District of Columbia courts have stated, " 'Where the external act, which is the cause or means by which death is brought about, is the act which is intended and is performed exactly in the manner intended, then the death is not one effected by accidental means.' " Smith, 203 A.2d at 170 (quoting Bernard v. Union Cent. Life Ins. Co., 117 F.Supp. 456, 458 (D.Mass.1954)).
 
 
 23
 Relying on Dr. Medley's observations, the district court held that Dr. Silvest had intentionally ingested a large number of Quaaludes and thus could not have died by accidental means as defined under District of Columbia law. Even though he took too many pills, the court noted that Dr. Silvest had intended to take the Quaaludes to maintain his manic euphoria.
 
 
 24
 The Guardian disputes the district court's findings. She asserts that Dr. Silvest's death was caused by an involuntary ingestion of alcohol and drugs. She claims that his mental illness drove him to ingest too many Quaaludes and thus he could not have been acting voluntarily when he swallowed the pills. Appellant's Br. at 16. Monumental General notes that there is no evidence that Dr. Silvest was incapable of making voluntary choices. Indeed, Dr. Medley believed that he was "intent on partying and obtaining a pleasant drug-induced high" that would approximate his manic phase. R. 35, Affidavit of Dr. Pamela Medley at para. (n).
 
 
 25
 The district court correctly held that the record on summary judgment required the conclusion that Dr. Silvest intentionally ingested the pills.[4] Although Dr. Silvest may not have intended to die and may have misapprehended the consequences of his action, he did intend to swallow the Quaaludes. Because this intentional act brought about his death, we cannot say that Dr. Silvest died by accidental means. The insurance policy, therefore, does not provide coverage for his death.[5]
 
 
 26
 C. Application of the Illinois Insurance Code
 
 
 27
 The district court determined that the provisions of the Illinois Insurance Code could not be invoked to provide recovery of fees and penalties for the Guardian. See Ill.Ann.Stat. ch. 73, para. 767 (Smith-Hurd Supp.1992). Citing McFarlane v. Life Insurance Co. of North America, No. 91 C 5034, 1992 WL 13009 (N.D.Ill. Jan. 22, 1992), the district court held that, because District of Columbia law applies to the policy, the Guardian has no cause of action under the Illinois Code. The Guardian, however, asserts that McFarlane was wrongly decided and that the case contravenes Illinois public policy, which protects insureds from unreasonable and vexatious denials of coverage.
 
 
 28
 We agree with the district court's disposition of the issue. Because the policy is governed by the substantive law of the District of Columbia, the Guardian cannot seek relief under the Illinois Insurance Code. See McFarlane, 1992 WL 13009 at * 4. Even if the Illinois Insurance Code were applicable, however, there is no evidence in the record that Monumental unreasonably and vexatiously denied coverage. We believe that Monumental General raised a legitimate denial of coverage based on interpretation of the policy language. "[A]ssertions of legitimate policy defenses and denials based on a policy's express wording are inappropriate for invoking this clause [para. 767]." Scudella v. Illinois Farmers Ins. Co., 528 N.E.2d 218, 223 (Ill.App.Ct.1988); see also Winston Network, Inc. v. Indiana Harbor Belt R.R., 944 F.2d 1351, 1360 (7th Cir.1991) (holding that where meaning of indemnity language was unclear, insurer did not deny claim vexatiously and unreasonably). As we have noted above, Dr. Silvest's death was not covered by the policy. Thus, even if the Illinois Insurance Code applied, the Guardian could not recover for vexatious denial of coverage because Monumental General engaged in a bona fide dispute regarding the policy language.
 
 Conclusion
 
 29
 For the foregoing reasons, we affirm the district court's grant of summary judgment to Monumental General.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 She also contends that we should not rely on the statement contained in the master policy that the policy was "issued in the District of Columbia." R. 26 at Ex. D. She contends that this statement is not sufficient in itself to demonstrate that the policy was issued in the District of Columbia and should thereby be governed by that jurisdiction's law. See Appellant's Br. at 11-12. This, however, is a bare assertion; she does not provide us with any evidence that the statement in the policy is untrue, and thus we shall not consider this argument
 
 
 [2]
 See also Restatement (Second) of Conflict of Laws § 192, comment h (1971) ("In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection.")
 
 
 [3]
 "The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law." Restatement (Second) of Conflict of Laws § 187, comment g (1971 & Supp.1988). Illinois courts refer to the Restatement. See Florida Risk Planning Consultants, Inc. v. Transport Life Ins. Co., 732 F.2d 593, 595 (7th Cir.1984); Ingersoll v. Klein, 262 N.E.2d 593 (Ill.1970)
 
 
 [4]
 In her brief, the Guardian contends that the district court improperly engaged in the factual determination of what Dr. Silvest's intent was when he ingested the Quaaludes. She claims that this question should be reserved for the jury because it goes to the issue of proximate cause. This argument is off the mark. For purposes of disclaiming coverage, it is necessary only to find that Dr. Silvest meant to swallow the Quaaludes. We also note, that the Guardian presented no evidence in opposition to Dr. Medley's affidavit stating that Dr. Silvest intended to maintain his manic high
 
 
 [5]
 Because we resolve this claim on the basis of whether Dr. Silvest died by accidental means, we shall not address whether his death was "caused or contributed to by illness or disease," which is also a coverage exclusion under the policy. We do note, however, that the Guardian's position on this issue seems incongruous considering her assertions on the issue of whether Dr. Silvest's ingestion of Quaaludes was intentional. In asserting that such action was not intentional, she argued that the doctor was driven by his illness to swallow the pills. Yet, she contends that the illness was not the proximate cause of the doctor's death and that he died of cardio-respiratory failure and thus she claims that his death was not caused or contributed to by disease or illness